Marc J. Randazza, NV Bar # 12265
D. Gill Sperlein (*pro hac vice*)
Alex J. Shepard, NV Bar # 13582
RANDAZZA LEGAL GROUP, PLLC
4035 S. El Capitan Way
Las Vegas, NV 89147
Telephone: 702-420-2001
Facsimile: 305-437-7662
ecf@randazza.com

*Attorneys for Plaintiff,*
*William Deans*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

WILLIAM DEANS, an individual,

Plaintiff,

vs.

LAS VEGAS CLARK COUNTY LIBRARY
DISTRICT, et al.,

Defendants.

Case No. 2:16-cv-02405-APG-PAL

## PLAINTIFF WILLIAM DEANS'S

## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

1.0      INTRODUCTION ........................................................................................................1

2.0      FACTUAL BACKGROUND AND LR 56-1 STATEMENT OF

           UNDISPUTED FACTS ...............................................................................................2

     2.1    *The Library* ...................................................................................................................2

     2.2    *Mr. Deans's Encounter at the Library* .........................................................................3

     2.3    *Library Policies and Procedures* ...................................................................................5

     2.4    *Procedural History* .......................................................................................................6

3.0      STANDING ................................................................................................................7

4.0      STANDARDS FOR SUMMARY JUDGMENT........................................................8

5.0      ARGUMENT ..............................................................................................................8

     5.1    *Defendant's Petition Policy and Rules of Conduct Violated Mr. Deans's*

            *First Amendment Rights* ...............................................................................................8

         5.1.1    The Plazas Outside the Library Are Traditional or Designated Public Fora ..............9

         5.1.2    Defendant's Conduct and Policies Imposed an Unconstitutional Prior Restraint

                on Mr. Deans's Speech ...............................................................................................13

         5.1.3    The Petition Policy Is Not a Reasonable Time, Place, and Manner Restriction .......16

         5.1.4    The Rules of Conduct Are Not a Reasonable Time, Place, and Manner

                Restriction .................................................................................................................20

     5.2    *Defendant's Policies Are Void for Vagueness* .............................................................21

         5.2.1    The Petition Policy is unconstitutionally vague ........................................................23

         5.2.2    The Rules of Conduct are unconstitutionally vague ..................................................25

6.0      CONCLUSION .........................................................................................................26

# TABLE OF AUTHORITIES

**CASES**

*Am. Civil Liberties Union of Nev. v. City of Las Vegas,*
  333 F.3d 1092 (9th Cir. 2003)................................................................10

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..........................................................................8

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002)........................................................................22

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963).........................................................................14

*Bd. of Educ. V. Pico,*
  457 U.S. 853 (1982)........................................................................16

*Berger v. City of Seattle,*
  569 F.3d 1029 (9th Cir. 2009)........................................................17, 19

*City of Chicago v. Morales,*
  527 U.S. 41 (1999)......................................................................22, 23

*Cornelius v. NAACP Legal Defense & Education Fund,*
  473 U.S. 788 (1985).........................................................................9

*Cuviello v. Cal Expo,*
  2013 U.S. Dist. LEXIS 106058 (E.D. Cal. July 27, 2013)..............................19

*Davison v. Loudon County Bd. of Supervisors,*
  2016 U.S. Dist. LEXIS 125083 (E.D. Va. Sept. 14, 2016)..............................13

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
  196 F.3d 958 (9th Cir. 1999).............................................................9

*Doe v. City of Albuquerque,*
  667 F.3d 1111 (10th Cir. 2012)..........................................................13

*Free Speech Coalition v. Reno,*
  198 F.3d 1083 (9th Cir. 1999)...........................................................22

*Frisby v. Schultz,*
  487 U.S. 474 (1988).......................................................................13

*Gammoh v. City of La Habra,*
  395 F.3d 1114 (9th Cir. 2005)...........................................................22

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ..................................................................................25

*Healy v. James,*
  408 U.S. 169 (1972) .............................................................................. 12, 16

*Kev, Inc. v. Kitsap County,*
  793 F.2d 1053 (9th Cir. 1986) ................................................................22

*Kinney v. Barnes,*
  443 S.W.3d 87 (Tex. 2014) ......................................................................14

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ..................................................................................22

*Kroll v. Incline Vill. Gen. Improvement Dist.,*
  598 F. Supp. 2d 1118 (D. Nev. 2009) ......................................................9

*Kuba v. 1-A Agric. Ass'n,*
  387 F.3d 850 (9th Cir. 2004) .............................................................. 16, 21

*Lakewood v. Plain Dealer Pub. Co.,*
  486 U.S. 750 (1988) ..................................................................................14

*McCullen v. Coakley,*
  134 S. Ct. 2518 (2014) ..............................................................................20

*Members of City Council v. Taxpayers for Vincent,*
  466 U.S. 789 (1984) ..................................................................................19

*Menotti v. City of Seattle,*
  409 F.3d 1113 (9th Cir. 2005) ..................................................................19

*Meyer v. Grant,*
  486 U.S. 414 (1988) ...........................................................................9, 14, 20

*Miller v. City of Cincinnatti,*
  622 F.3d 524 (6th Cir. 2010) .............................................................. 22, 25

*Minarcini v. Strongsville City School Dist.,*
  541 F.2d 577 (6th Cir. 1976) ....................................................................10

*Neb. Press Ass'n v. Stuart,*
  427 U.S. 530 (1976) ..................................................................................14

*Niemotko v. Maryland,*
  340 U.S. 268 (1951) ..................................................................................13

RANDAZZA | LEGAL GROUP

*Prigmore v. City of Redding,*
   211 Cal. App. 4th 1322 (2012)................................................................10

*Rosen v. Port of Portland,*
   641 F.2d 1243 (9th Cir. 1981)................................................................13

*Schenck v. Pro-Choice Network of W. N.Y.,* 519 U.S. 357 (1997) ........................17

*Seattle Affiliate of the October 22nd Coalition to Stop Police Brutality, Repression &*
   *the Criminalization of a Generation v. City of Seattle,* 550 F.3d 788 (9th Cir. 2008) ........................13, 16

*Shuttlesworth v. Birmingham,*
   394 U.S. 147 (1969)................................................................13

*Six Star Holdings, LLC v. City of Milwaukee,*
   821 F.3d 795 (7th Cir. 2016)................................................................14

*Thomas v. Chi. Park Dist.,*
   534 U.S. 316 (2002)................................................................13

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969)................................................................12

*Tucson Woman's Clinic v. Eden,*
   379 F.3d 531 (9th Cir. 2004)................................................................22

*United States v. Weitzenhoff,*
   35 F.3d 1275 (9th Cir. 1994)................................................................22

*Univ. & Cmty. College Sys. Of Nev. v. Nevadans for Sound Gov't,*
   120 Nev. 712 (2004)................................................................19

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. Of Stratton,*
   536 U.S. 150 (2002)................................................................14

*Widmar v. Vincent,*
   454 U.S. 263 (1981)................................................................9

## STATUTES

NRS 207.200................................................................8

NRS 293.127565................................................................4, 6, 18, 19

**RULES**

Fed. R. Civ. P. 56 ................................................................................................................. 8

**CONSTITUTIONAL PROVISIONS**

Article 1, Section 9 of the Nevada Constitution ......................................................... 8

First Amendment to the United States Constitution ........................................... 8, 9, 16, 20

RANDAZZA | LEGAL GROUP

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff William Deans hereby files his Motion for Summary Judgment and requests that the Court enter summary judgment in his favor as to all claims.

**1.0     INTRODUCTION**

On October 13, 2016, Plaintiff William Deans was exercising his First Amendment right to engage in political speech by obtaining signatures for a petition to place the Automatic Voter Registration Initiative on the ballot in Nevada and by instructing his fellow citizens how to register to vote prior to the October 18, 2016 deadline.  He did this at the West Charleston Public Library (the "Library"), a public library located at the College of Southern Nevada, where many civically-minded citizens come to educate themselves.

Rather than encouraging this innocuous activity, Defendant and its employees told Plaintiff that he had to "register" with the Library staff before he could engage in this protected activity.  They also told Mr. Deans he could only engage in his protected activity in a small area away from any likely foot traffic.

When Plaintiff rightfully pointed out he had a First Amendment Right to engage in this activity, a College of Southern Nevada ("CSN") security officer, acting as an agent of the Library, threatened Mr. Deans with arrest if he did not leave the premises immediately.

Mr. Deans did ultimately leave the premises in response to this threat of arrest, but that was not enough for Defendant.  It also issued Plaintiff a "Notice of Trespass" requiring him to leave the Library and forbidding him from visiting **any** LVCCLD branch for a period of at least **one year**. In the absence of the preliminary injunction the Court entered, Mr. Deans is subject to arrest if he visits *any* branch of the LVCCLD, whether to check out books, to participate in Library activities, or to advocate for voter registration outside any public libraries anywhere in Clark County.  Defendant's actions chilled core political speech and imposed an unconstitutional prior restraint on Plaintiff's attempts to engage the voting public.

The parties have already undergone discovery and had an extensive evidentiary hearing on the merits of this case.  There are no disputed material facts, and thus the matter is ripe for summary

judgment.   The Court should permanently enjoin Defendant from further infringing Plaintiff's constitutional rights, and order Defendant to pay attorneys' fees and costs to compensate Plaintiff for the expense of vindicating his constitutional rights.   Further proceedings may be required to determine the appropriate amount of money damages.

**2.0   FACTUAL BACKGROUND AND LR 56-1 STATEMENT OF UNDISPUTED FACTS**

**2.1   The Library**

On October 13, 2016, Plaintiff positioned himself outside the West Charleston Public Library in Las Vegas, Nevada (the "Library").  (*See* ECF No. 3-1 at ¶¶7-11.)  The entrance plaza to the Library:

> is an aesthetically attractive, circular outdoor space of about 75 feet in diameter.  Three partial spirals of large stone columns flank the library entrance on the west end of the plaza and help set the plaza apart from the parking lot.  A bench sits on the east side.  The plaza's ample physical space (around 5,000 square feet) both invites public discourse and mitigates concern that speech activity will necessarily interfere with library ingress and egress.

(ECF No. 25 at 4 [citations omitted]; *see also* ECF No. 17-1.)  People use the Library entrance plaza both to enter and leave the Library, and also as a thoroughfare to and from the CSN campus.  (*See* ECF No. 30 at 13:14-15:11.)

Members of Defendant's Board of Trustees have stated that all speakers on library grounds must be treated equally because "[p]ublic forums cannot be regulated by content and use, only when, where and how can be regulated" (ECF No. 12-7), and that "the District has one of the most lenient entrance policies as a government agency."  (ECF No. 12-8.)  Defendant's Public Services Director, Marie Cuglietta, has said during Board of Trustees meetings that "public libraries are a place for access to free and open communication, subject only to reasonable restrictions as to time, place and manner."  (December 11, 2008 minutes for LVCCLD Board of Trustees meeting, LVCCLD001457, attached as **Exhibit 1**; November 12, 2009 minutes for LVCCLD Board of Trustees meeting, LVCCLD001642, attached as **Exhibit 2**.)

The Library is also located on the campus of the College of Southern Nevada ("CSN"), which has stated that "the whole campus is a free speech zone" (ECF No. 12-5 at 19:15-18, 22:4-7), and

has "adopted the policy that all outside areas are available for free speech activity subject to requirements that it not unduly impact its primary educational purpose." (ECF No. 10 at 4:5-8.) Defendant has also stated that it:

> provides welcoming and inspiring spaces for reading, learning and achieving, and the tools and resources that families, children, teens and adults need to succeed. The Library is committed to building communities of people who can come together to pursue their individual and group aspirations.

(ECF No. 12-6.) Defendant "seek[s] innovative ways to . . . [c]reate a sense of community by providing a welcoming, inviting, secure environment for our public and staff." (*Id*.)

In the 2013-2014 fiscal year, "almost 6.5 million people visited [LVCCLD] branches to check out a book, listen to a story time, use a public computer, attend a workshop, hear an author speak, or just read or study in a clean, safe, and pleasant space." (Technology Plan for Las Vegas-Clark County Library District: FYE 2016-2018, attached as **Exhibit 3**, at LVCCLD000230.) Defendant considers its "inviting public libraries" to be "the cornerstones of our diverse communities where children and adults can experience personal enrichment and connect with one another." (**Exhibit 3** at LVCCLD000232.) Defendant uses the libraries to host public events that may not fall within the more conservative definitions of traditional library activities. (*See* minutes from April 9, 2015 LVCCLD Board of Trustees' Meeting, LVCCLD002832, attached as **Exhibit 4**) (describing LVCCLD branch hosting "Anime Fest" on March 14, 2015, including stations for costumes and video games).

### 2.2   Mr. Deans's Encounter at the Library

On October 13, 2016, Plaintiff circulated a petition to be placed on the ballot in Nevada. Plaintiff distributed this petition and both encouraged people to register to vote in Nevada and provided instructions on how they could register to vote. (*See* ECF No 3-1 at ¶¶6, 12, & 13.)

Not long after Mr. Deans began this protected activity, Sam Kushner ("Kushner"), the Assistant Branch Manager of the Library, informed Mr. Deans that he could neither collect signatures nor instruct citizens about how to register to vote, unless he "checked in" with the Library. (*See* ECF

No. 30 at 144:8-24.)  Kushner told Mr. Deans that if he was approved, he would have to relocate to a certain spot at the outer perimeter of the Library entrance plaza, where there was significantly less pedestrian traffic.  (ECF No. 3-1 at ¶¶ 21-23; *see also* ECF No. 3-2.)  Kushner told Mr. Deans that if he did not relocate to this spot, Kushner would ask him to leave the Library for the day.  (*See* ECF No. 30 at 145:16-21.)

The "petitioning spot" at the Library is not marked on the ground and the Library has no pictorial representation depicting the boundaries of the petition spot.  (*See* ECF Nos. 17-1, 17-13.) The written description the Library provided to the Nevada Secretary of State pursuant to NRS 293.127565 reads as follows: "At the east entrance a [sic] the far edget [sic] of the center circle." (ECF No. 11-3.)  At the time of Mr. Deans's visit to the Library, the Library considered the petitioning spot to be a small space at the outer edge of the Library entrance, approximately 70 feet from the entrance doors and directly in front of a handicap access ramp.  (*See* ECF Nos. 3-1 at ¶ 22, 3-2, 30 at 154:12-156:2, 170:14-171:10, 172:20-173:3, 225:11-23, 254:4-9.)  For clarity, the "petition spot" Mr. Deans was instructed to go to is accurately depicted in ECF No. 11-7 as the space between two pillars in the foreground of that photograph and immediately in front of the access ramp shown. When Mr. Deans refused to restrict his protected activities to this petitioning spot, Kushner's supervisor, Florence Jakus ("Jakus"), and Librarian Steve Dimoulas ("Dimoulas") also informed Mr. Deans the he could petition only in the designated spot.  (*See* ECF No. 3-1 at ¶ 23.)

Mr. Deans informed Kushner, Jakus, and Dimoulas that he had a constitutional right to engage in speech activities in the plaza and it was a violation of his First Amendment rights to condition his public participation on registration or approval and to restrict his petitioning activity to a small designated spot.  (ECF No. 3-1 at ¶ 24; ECF No. 30 at 23:15-24:2.)  After Mr. Deans protested, Kushner summoned College of Southern Nevada ("CSN") police officers to force Mr. Deans to leave the Library premises.  (ECF No. 3-1 at ¶ 24; ECF No. 30 at 162:3-5.)  The officers arrived, including Antonia Summerlin.  Summerlin instructed Mr. Deans that he had to leave the Library premises.  (ECF No. 3-1. at ¶¶ 25 & 26.)  In doing so, she claimed she was the "duly appointed representative of the owner of the public library."  (*See* ECF No. 12-3 at 4:11-18.)  This Notice of

Trespass was not issued because Mr. Deans was allegedly blocking anyone from entering or exiting the Library, but rather because he was not circulating his petition or telling people how to register to vote, while constrained to this "spot." (*See* ECF Nos. 3-3; 11-5; 12-2; 12-3 at 3:1-3; & 30 at 182:19-183:6.)

Kushner then filled out a Notice of Trespass directed at Mr. Deans, forbidding him from visiting any LVCCLD branch for one year, which Summerlin then issued to Mr. Deans on behalf of the Library.  (*See* ECF No. 3-3; 30 at 222:7-9.)  Summerlin additionally told Mr. Deans he would be arrested if he at any point entered the premises of any branch of the LVCCLD while the Notice of Trespass was still in effect, and he would be arrested if he did not leave the Library grounds.  (*See* ECF No. 3-1 at ¶¶ 31 & 33.)  Frightened by the threat of arrest, Mr. Deans left the library.  (*Id.* at ¶ 34.)

## 2.3    Library Policies and Procedures

The Library has two policies relevant here.  The first is the Library Rules of Conduct (the "Rules of Conduct"), which forbid, *inter alia*, "failure to comply with reasonable staff instruction." (ECF No. 11-5.)  This rule was adopted in 2016 as "a catchall for items not listed," as "[s]taff realizes that a policy cannot list every possible offense."  (ECF No. 13-2 at 5.)  The Rules of Conduct state that Defendant "welcomes all visitors and provides excellent service in a pleasant and safe atmosphere" and prohibits "behaviors and activities that interfere with the safe, secure, and respectful use of libraries," including "[c]onduct that endangers or disturbs library users or staff in any way, or that hinders others from using the library or its resources."  (ECF No. 11-5.)  The Rules of Conduct provide that "[f]ailure to comply with the Library Rules of Conduct may result in . . . exclusion from the library for a period of one day to one year, depending on the seriousness of the infraction."  (ECF No. 11-5.)  At all relevant times, however, Defendant ignored this Rule and had a policy of trespassing people for one year regardless of the severity of an offense.  (*See* ECF No. 30 at 291:17-24.)

The second policy is Defendant's "Petitioner & Voter Registration Guidelines" (the "Petition Policy").  (*See* ECF No. 11-4.)  This policy requires petitioners to "check in with the [LVCCLD] Person in Charge (PIC) prior to set up," and requires them to follow the Rules of Conduct.  (*Id.*) The policy also states that petitioners "must set up within the designated zone that LVCCLD has

filed with the Secretary of State's Office," and petitioners "must remain within the designated petitioner zone." (*Id.*)  It also provides that petitioners "who engage in heated discourse and aggressive debates with patrons or opposing petitioning groups with be asked to leave Library District property." (*Id.*)  The PIC "has the final discretion of authority over violations of these guidelines and our Library Rules of Conduct." (*Id.*)  According to the current version of Defendant's Person-in-Charge Manual[1] (the "PIC Manual"), a petitioning zone must be located "no less than 50 feet from the main entrance" of a given library branch. (*See* LVCCLD PIC Manual (4.02), attached as **Exhibit 5**, at LVCCLD000292.)

It is Defendant's position that its authority to restrict petitioning activity stems from NRS 293.127565.  The current version of its PIC Manual provides that "[s]elling or solicitation is prohibited on library property, except to gather signatures for petitions as outlined in NRS 293.127565 or in accordance with the District's meeting room use agreements." (**Exhibit 5** at LVCCLD000264.)  In responding to discovery, Defendant stated that it relied on the express authority provided by NRS 293.127565(2) in creating and implementing the Petition Policy. (*See* Defendant's Responses to Mr. Deans's First Set of Interrogatories, attached as **Exhibit 6**, at Response Nos. 1, 4, 13, 15.)

### 2.4    Procedural History

Mr. Deans filed this suit and sought a temporary restraining order against Defendants on October 15, 2016. (*See* ECF Nos. 1, 3.)  The Court heard the TRO motion on an emergency basis on October 17, 2016.  Defendant LVCCLD claimed that its actions were justified under NRS 293.127565 and that its policy was a reasonable time, place, and manner restriction.  Defendant CSN disputed Mr. Deans's factual account of his actions at the Library.  The Court granted Mr. Deans's requested TRO, finding, *inter alia*, that there were serious questions about the constitutionality of the statute as relied upon by LVCCLD and the balance of hardships tipped in Mr. Deans's favor.

---

[1]    The PIC Manual is a training and reference manual for library staff. (*See* ECF No. 30 at 275:22-276:8.)

1   The parties then conducted limited discovery and provided briefing for entry of a preliminary

2   injunction.  During the course of this discovery, it took Defendant several days to decide on a proper

3   description of the petitioning spot.  (*See* ECF No. 13-4.)  The Court then conducted a full-day

4   evidentiary hearing on the motion for a preliminary injunction.  During the hearing, both Kushner

5   and Jakus interpreted the language "center circle" in Defendant's designated petitioning spot as the

6   center of the Library entrance, rather than the small outer edge of the entrance that Library staff

7   enforced against Mr. Deans.  (*See* ECF Nos. 11-6; 30 at 139:15-18, 189:18-20; 246:4-19.)  Jakus,

8   however, changed her interpretation of the designated spot description during her testimony.

9   (*See* ECF No. 30 at 245:15-247:21.)

10   The Court found that the Library entrance plaza "indisputably offers free access to the

11   public." (ECF No. 25 at 3.)  It also determined that "the plaza's ample physical space (around 5,000

12   square feet) both invites public discourse and mitigates concern that speech activity will necessarily

13   interfere with library ingress and egress." (*Id.* at 4.)  It then found that the Library entrance is likely

14   a traditional public forum, and that the Petition Policy is likely not a reasonable time, place, and

15   manner restriction, and entered a preliminary injunction against Defendant allowing Mr. Deans to

16   conduct petitioning activities at the Library entrance roughly equal to half the area of the entrance.

17   (*See id.* at 5-9.)

18   **3.0   STANDING**

19   "To qualify as a party with standing to litigate, a person must show, first and foremost, an

20   invasion of a legally protected interest that is concrete and particularized and actual or imminent."

21   *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997).  A plaintiff can show standing by

22   demonstrating that they "have been threatened with prosecution, [if] a prosecution is likely, or even

23   [if] a prosecution is remotely possible." *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614,

24   618 (9th Cir. 1999).  In the First Amendment context in particular, a plaintiff has standing to sue if a

25   challenged statute operates to "chill" the plaintiff's exercise of his or her First Amendment Rights.

26   *Id.* at 618-19 (citing *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).

27

1    Here, Mr. Deans's harm is readily apparent.  He has been forbidden from entering the

2    premises or grounds of any branch of Defendant's libraries, either inside or outside.  He was given

3    the Notice of Trespass barring him from these premises because he circulated a political petition,

4    advised people on how to register to vote, and refused to relocate to a small "petitioning spot" where

5    his activities would have been much less effective.  Mr. Deans intended to peacefully stand in the

6    large piazza outside of the West Charleston Public Library.  When he did so, he neither impeded

7    traffic nor disturbed anyone.  He sought signatures for a political petition and informed people on

8    the voter registration process.  When Defendant issued the Notice of Trespass, it threatened

9    Mr. Deans with arrest if he did not vacate the premises, or if he returned to any public library within

10   one year, regardless of motive or activity.  This creates a true case and controversy sufficient to confer

11   Article III standing.  Plaintiff thus has standing.

12   **4.0   STANDARDS FOR SUMMARY JUDGMENT**

13   Summary judgment is appropriate when "there is no genuine issue as to any material fact and

14   that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only disputes over

15   facts that might affect the outcome of the suit will preclude the entry of summary judgment.  The

16   disputed evidence must be "such that a reasonable jury could return a verdict for the non-moving

17   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

18   **5.0   ARGUMENT**

19        **5.1   Defendant's Petition Policy and Rules of Conduct Violated Mr. Deans's First**

20             **Amendment Rights**

21   Defendant violated Plaintiff's constitutional rights, specifically by requiring First Amendment

22   protected activity to be corralled into a miniscule and ill-defined area, and then issuing a Notice of

23   Trespass under NRS 207.200 and threatening to enforce it, against Plaintiff for his conduct protected

24   under the First Amendment and Article 1, Section 9 of the Nevada Constitution.

25   Courts use a three-part test to evaluate a First Amendment claim: (1) whether the speech is

26   protected; (2) the nature of the forum where the speech is to occur and the proper standard for

27

restrictions in that forum; and (3) whether the government justification satisfies the applicable standard. *See Cornelius v. NAACP Legal Defense & Education Fund*, 473 U.S. 788, 797 (1985).

Defendant admits that Mr. Deans's activities are protected under the First Amendment. (*See* ECF No. 11 at 7.)  He was engaged in political speech, the very core of the First Amendment. "The solicitation of signatures for a petition involves protected speech." *Meyer v. Grant*, 486 U.S. 414, 422 n.5 (1988).  Such speech is "at the core of our electoral process and of the First Amendment freedoms – an area of public policy where protection of robust discussion is at its zenith." *Id.* at 425. This means the only issues to resolve are the type of public forum at issue and whether the restrictions in question satisfy the applicable legal standards.

### 5.1.1   The Plazas Outside the Library Are Traditional or Designated Public Fora

The central point of this suit is the regulation that Defendants relied on issuing the Notice of Trespass.  The first step in determining whether Defendant's regulations are constitutional is to discern whether the location to which the regulations apply is a traditional public forum, a designated public forum, or a limited public forum.  The type of forum at issue determines the applicable standard in deciding whether the regulations are constitutional.

A traditional public forum is "property that has always been open to the public, such as public parks or sidewalks," and a designated public forum is "property that has been opened to all or part of the public." *Kroll v. Incline Vill. Gen. Improvement Dist.*, 598 F. Supp. 2d 1118, 1126 (D. Nev. 2009). Where the government has generally opened a place to the public, such as a University campus, any restrictions on speech there are judged by the same standards as a traditional public forum.  *See Widmar v. Vincent*, 454 U.S. 263, 267-68 (1981).  Content-based restrictions on activity within these fora are reviewed using strict scrutiny.  Limited public fora are "a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999).  Content-based restrictions in these fora are permissible if they are "viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* at 1075.

RANDAZZA | LEGAL GROUP

1   The Ninth Circuit applies a three-factor test in determining whether an area is a traditional

2   public forum: "1) the actual use and purposes of the property, particularly status as a public

3   thoroughfare and availability of free public access to the area; 2) the area's physical characteristics,

4   including its location and the existence of clear boundaries delimiting the area; and 3) [the] traditional

5   or historic use of both the property in question and other similar properties." *Am. Civil Liberties Union*

6   *of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1100-01 (9th Cir. 2003).

7        Here, there is the additional consideration of whether different areas of a public library may

8   be different types of public fora.   The California case of *Prigmore v. City of Redding*, 211 Cal. App. 4th

9   1322 (2012) provides guidance.  *Redding* dealt with organizations that wished to petition in the outdoor

10  areas of a public library, specifically a "covered area of approximately 765 square feet [with] two

11  cement columns, a sculpture, several benches, and a newspaper rack."  *Id.* at 1328.   Given the

12  differences between the interior and exterior areas of the library, the court found that "a 'more

13  tailored approach'" to the public forum analysis was appropriate.  *Id.* at 1338.   The library in *Redding*

14  offered "complete, unrestricted public access" to the outdoor area, and "[t]he entrance is larger than

15  the typical sidewalk and includes several benches and a newspaper rack.   It is an area where people

16  can rest or congregate for lengthy conversation."  *Id.* at 1339.[2]  The court found that "[c]haracterizing

17  the area as a public forum is consistent with the role of a library as 'a mighty resource in the free

18  marketplace of ideas.   It is specially dedicated to broad dissemination of ideas.   It is a forum for silent

19  speech.'"  *Id.* (quoting *Minarcini v. Strongsville City School Dist.*, 541 F.2d 577, 582-83 (6th Cir. 1976)).

20  The *Redding* court also distinguished the outdoor portion of the library "from, for example, stand-

21  alone retail establishments that do not invite people to congregate, to meet friends, rest, or be

22  entertained, and are not public forums."  *Id.*

23       The facts here are on all fours with *Redding*.   As the Court found in issuing the preliminary

24  injunction, the Library entrance plaza is an open, aesthetically pleasing area that is much larger than

25  the average sidewalk.   It contains several pillars, a bench, and a circular area larger than necessary to

26

27       [2]   ECF No. 17-11 contains a photograph of the library entrance in *Redding*.

allow ingress and egress to and from the Library.  (*See* ECF Nos. 17-11; 25 at 4.)  The Court reinforced this conclusion following the preliminary injunction hearing when it found that the entrance plaza:

> is an aesthetically attractive, circular outdoor space of about 75 feet in diameter.  Three partial spirals of large stone columns flank the library entrance on the west end of the plaza and help set the plaza apart from the parking lot.  A bench sits on the east side.  The plaza's ample physical space (around 5,000 square feet) both invites public discourse and mitigates concern that speech activity will necessarily interfere with library ingress and egress.

(ECF No. 25 at 4 [citations omitted]).  Indeed, the circular center appears to be designed in such a way to evoke the impression of the traditional Greek or Roman forum.  While the Library is surrounded by a parking lot, there are no physical barriers impeding access to the Library's entrances.  These physical characteristics indicate that the area is meant for unrestricted public access, and is thus more like a traditional or designated public forum than a limited public forum.  Additionally, the library is connected to the CSN campus, across street from Bonanza High School, one block from Fighters Memorial Park, and two blocks from Gary Dexter Park, all public buildings or places.  Though it may not be at the nerve center of CSN's campus, this location also suggests that the Library's entrances are thoroughfares that receive significant pedestrian traffic.

There is ample evidence that Defendant intends for its entrances, if not the entirety of the Library, to be a traditional or designated public forum.  Defendant has stated to the public that it "provides welcoming and inspiring spaces for reading, learning and achieving, and the tools and resources that families, children, teens and adults need to succeed.  The Library is committed to building communities of people who can come together to pursue their individual and group aspirations." (ECF No. 12-6.)  It also "seek[s] innovative ways to . . . [c]reate a sense of community by providing a welcoming, inviting, secure environment for our public and staff." (*Id.*)  Defendant considers its "inviting public libraries" to be "the cornerstones of our diverse communities where children and adults can experience personal enrichment and connect with one another." (**Exhibit 3** at LVCCLD000232.)  Its Public Services Director has stated that "public libraries are a place for access to free and open communication, subject only to reasonable restrictions as to time, place and

manner." (**Exhibits 1 & 2**.)  These statements are consistent with the conclusion that Defendant intends that its libraries be treated as traditional or designated public forums.

It additionally appears that Defendant has intended at least portions of its libraries to be public forums for over a decade.  In 2004, when discussing a policy regarding fees for rental of certain library spaces, a member of the LVCCLD Board of Trustees stated that "[t]he District can regulate use of its meeting rooms by time, place and manner, but all non-profits are treated alike," and that if any fees were to be charged they must be equal because "[p]ublic forums cannot be regulated by content and use, only when, where and how can be regulated." (ECF No. 12-7 at 7.)  And in 2011, when discussing a proposed rule regarding searches of library patrons, a board member noted "that the District has one of the most lenient entrance policies as a government agency." (ECF No. 12-8 at 11.)  These statements indicate Defendant does, and for a long time has, considered at least portions of its libraries to be traditional or designated public forums.

Finally, the Library is located on CSN's campus.  CSN has stated that the college does not restrict petitioning activities to "public speech zones" (*see* ECF No. 12-5 at 19:15-18, 22:4-7), and that "absent harassing or impeding the patrons, there is no issue . . . relative to the petition gathering." (*Id.* at 20:24-21:2.)  It would be accurate to say "the whole campus is a free speech zone." (*Id.* at 24:5-7.)

The Supreme Court has found that "the vigilant protection of constitutional freedom is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972).  It has stated that "the college classroom and its environs is peculiarly the 'marketplace of ideas," *id.*, and "[n]either students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gates." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).  The mere "undifferentiated fear of apprehension of a disturbance is not enough to overcome the right to freedom of expression on a college campus." *Healy*, 408 U.S. at 191.  The fact that CSN itself considers the entirety of the CSN campus a "free speech zone," and the Library is located on CSN's campus, makes manifestly clear that the Library is a traditional, or at least designated, public forum.  Other courts have found that public libraries are at least designated public fora.  *See, e.g., Doe*

*v. City of Albuquerque*, 667 F.3d 1111, 1130 (10th Cir. 2012) (finding that "the City's public libraries

constitute designated public fora," and noting that cases classifying libraries as "limited public fora"

have in practice applied the test for designated public fora). Even if there were not prior examples

of public libraries being considered designated public fora, the kind of spaces that constitute public

fora is hardly static. *See Davison v. Loudon County Bd. of Supervisors*, 2016 U.S. Dist. LEXIS 125083

(E.D. Va. Sept. 14, 2016) (finding that county government Facebook profile inviting public comment

made it a limited public forum).

For these reasons, the east entrance of the Library is a traditional, or at least designated public

forum. Accordingly, any content-based restrictions on speech at the entrance must satisfy strict

scrutiny. Any content-neutral time, place, and manner restrictions must satisfy intermediate scrutiny.

### 5.1.2   Defendant's Conduct and Policies Imposed an Unconstitutional Prior Restraint on Mr. Deans's Speech

There are two kinds of prior restraints in the free speech context: those that "'authorize a

licensor to pass judgment of speech' and those whose purpose 'is not to exclude communication of

a particular content, but to coordinate multiple uses of limited space' on a content-neutral basis."

*Seattle Affiliate of the October 22nd Coalition to Stop Police Brutality, Repression & the Criminalization of a

Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008) (quoting *Thomas v. Chi. Park Dist.*, 534

U.S. 316, 322 (2002)). The Petition Policy requires petitioners to "check in" with Library staff before

they are allowed to engage in petitioning activity. (*See* ECF No. 11-4.) Furthermore, the Notice of

Trespass issued to Mr. Deans prohibits him from even stepping foot on public library grounds for a

year. (*See* ECF No. 3-3.)

The rule requiring registration before authorizing public advocacy in "the archetype of a

traditional public forum," *Frisby v. Schultz*, 487 U.S. 474, 480 (1988), is a prior restraint on speech.

*See Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-151 (1969); *Niemotko v. Maryland*, 340 U.S. 268, 271

(1951). "Advance notice or registration requirements [can] drastically burden free speech." *Rosen v.

Port of Portland*, 641 F.2d 1243, 1249 (9th Cir. 1981). "It is offensive – not only to the values protected

by the First Amendment, but to the very notion of a free society – that in the context of everyday

public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. Of Stratton,* 536 U.S. 150, 165-66 (2002).  Such bans place an objective burden on the exercise of free speech, and essentially ban spontaneous speech.  *See id.*

"Prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights."  *Neb. Press Ass'n v. Stuart,* 427 U.S. 530, 559 (1976).  "The Supreme Court has roundly rejected prior restraint."  *Kinney v. Barnes,* 443 S.W.3d 87, 91 n.7 (Tex. 2014) (citing SOBCHAK, W., THE BIG LEBOWSKI, 1998)).  Prior restraints "bear a heavy presumption against [their] constitutional validity."  *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 (1963).

Regulatory schemes that require licensing before a person may engage in protected speech are only permitted where "there are procedural safeguards that ensure that the decision maker approving the speech does not have 'unfettered discretion' to grant or deny permission to speak." *Six Star Holdings, LLC v. City of Milwaukee,* 821 F.3d 795 (7th Cir. 2016).  "At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."  *Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 757 (1988).  The fact that one person may, without any checks or balances, impose a prior restraint "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused."  *Id.*

The Petition Policy requires petitioners to check in before they can petition on library grounds, and may only engage in such conduct in designated spots.  (*See* ECF No. 11-7.)  Even if a person does not need to fill out a registration form or give notice days in advance, this requirement still chills protected speech, and serves as a prior restraint.  *See Grant,* 486 U.S. at 422 n.5.  Because there is a "heavy presumption against [the] constitutional validity" of this provision, Defendant must justify this requirement.  As explained in Section 5.1.3, *infra,* it cannot do so.

The Petition Policy also leaves unfettered discretion to a single government employee to restrict petitioning activity.  The Petition Policy requires people to "check in" with the PIC prior to petitioning, requires petitioners to comply with the Library Rules of Conduct, restricts petitioners to

RANDAZZA | LEGAL GROUP

1  a "designated petitioner zone," which even the Library staff could not agree upon the location of,

2  and the state-filed designation gives no guidance on.  The Rules also give the PIC "final discretion"

3  in allowing petitioners to use items such as "tents, tables, [and] chairs."  It also prohibits "heated

4  discourse and aggressive debates with patrons opposing petitioning groups" and, most importantly,

5  gives the PIC "final discretion of authority over violations of these guidelines and our Library Rules

6  of Conduct."  (ECF No. 11-4.)  There are no principles or guidelines limiting this discretion.

7  The PIC's decisions regarding whether a person may engage in petitioning activity under the Petition

8  Policy does not appear to be subject to any form of review.  Thus, the Petition Policy is an

9  unconstitutional prior restraint.

10         More egregious is the Notice of Trespass issued against Mr. Deans, which is based upon an

11  alleged violation of the Rules of Conduct.  The Rules of Conduct specify that violating any rule "may

12  result in . . . exclusion from the library for a period of one day to one year, depending on the

13  seriousness of the infraction."  There are no objective standards or criteria for determining when a

14  violation may justify a one-year ban.  In fact, for the ten years prior to July 2016, the rules *mandated* a

15  one-year ban, regardless of the severity of a rules violation.  (*See* ECF No. 13-2 at 6.)  At the time of

16  the preliminary injunction hearing, the default period for a trespass was still one year, regardless of

17  the infraction.  (*See* ECF No. 30 at 291:17-24 ["Q. My client argued about the petition spot, he got a

18  year.  A. Right.  Q. So, it's a year, a year, a year, no matter what you do.  A. Yes"]; *id.* at 297:15-24.)

19  The minutes of the meeting in which this policy was changed do not provide any guidance as to when

20  a lesser penalty may be appropriate, only stating "there have been varying degrees of incidents and

21  range of offenses in which a shorter timeline was appropriate."  (*Id.*)  The PIC Manual does not

22  provide any guidance on when a shorter suspension may be warranted, either, stating only that

23  "[d]epending on the seriousness of the infraction, any patron who violates any of these Rules of

24  Conduct may be trespassed from the Library District for a period of up to one year."  (**Exhibit 5** at

25  LVCCLD000265.)

26         There is no question that banning a person from all public libraries in Clark County for an

27  entire year is a prior restraint on speech.  By the terms of the Notice of Trespass, a trespassed patron

RANDAZZA | LEGAL GROUP

cannot circulate petitions on library property, speak to patrons on library property, read books in any library, or even enter the areas of any library explicitly designated as public fora.  (*See* ECF No. 12-8 at 6; ECF No. 12-7 at 7).  To act in violation of the Notice of Trespass brings with it the threat of imprisonment, which is a significant chill on expressive conduct.  There is a constitutional right to receive information and ideas, which "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the constitution . . . [T]he right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom."  *Bd. of Educ. V. Pico*, 457 U.S. 853, 867 (1982) (emphasis original).  A trespassee is completely cut off from a font of knowledge and a popular forum for discussion, thus significantly infringing his First Amendment rights.  This prior restraint does not have any principled justification for existing, and thus is unconstitutional.

### 5.1.3   The Petition Policy Is Not a Reasonable Time, Place, and Manner Restriction

A content-neutral time, place, and manner restriction in a traditional or limited public forum is only valid under the First Amendment if the restriction (1) is narrowly tailored to serve a significant government interest; and (2) leaves open ample alternatives for communication.  *See Seattle Affil.*, 550 F.3d at 798.

#### 5.1.3.1     The Petition Policy is Not Narrowly Tailored

In order for a time, place, and manner restriction to be narrowly tailored it must further a substantial government interest and must not burden substantially more speech than is necessary to further that interest.  *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 861 (9th Cir. 2004).  There must be a legitimate harm the government is trying to redress or prevent; mere speculation that speech would be disruptive is insufficient, as "undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression on a college campus."  *Healy*, 408 U.S. at 191.

Defendant notes that "[t]he check-in requirement does not require Petitioners to submit any written information and the Library District does not keep any written records regarding Petitioners. A Petitioner simply must notify Library District staff that they are on the premises to collect

1   signatures on a petition.  In particular, the Library District staff does not require that a Petitioner

2   disclose his or her identity or the nature or subject of the petition." (*Id.*)  This may save the Policy

3   from being viewpoint-based, but it also shows that there is no legitimate purpose to the check-in

4   requirement.  As the Court noted at the TRO hearing, if the purpose of checking in is simply to let

5   the library know that people are petitioning outside, this could be achieved just as effectively by

6   looking out a door.  (*See* ECF No. 12-5 at 46:23-47:7.)  At the preliminary injunction hearing, Jakus

7   testified that the "check in" requirement did not necessarily avoid purported problems caused by a

8   petitioner.  (*See* ECF No. 30 at 243:23-244:9.)  Thus, the only effect of the notice requirement is to

9   burden spontaneous petitioning activities.  *See Berger v. City of Seattle*, 569 F.3d 1029, 1038 (9th Cir.

10  2009) (In striking down permitting requirement for performers in public forum, noting that "advance

11  notification requirements eliminate 'spontaneous speech,'" and that such requirements imposed on

12  individuals are especially constitutionally suspect).

13          The Petition Policy's restriction of petitioning activity to designated spots is equally

14  unconstitutional.  It cordons off a tiny sliver of Library grounds and claims that petitioning activity

15  may **only** occur there.[3]  It imposes this restriction without any regard for the number of people who

16  wish to use that spot, how much space they will occupy (whether they will use a table or simply a

17  clipboard), or whether the Library entrance is experiencing a significant degree of pedestrian traffic.

18  It is a flat, categorical restriction on this activity, regardless of whether the circumstances justify it.

19  The Supreme Court has struck down such restrictions under similar facts.  *See Schenck v. Pro-Choice*

20  *Network of W. N.Y.*, 519 U.S. 357, 377-79 (1997) (finding that restriction creating 15-foot "buffer

21  zone" between speaker and audience on sidewalks outside healthcare clinics was not narrowly

22  tailored).  Defendant's policy on where to designate a petition zone is also fatally flawed.  The PIC

23  Manual specifies that petition zones must be placed at least 50 feet from the main entrance of a library

24  building, without any regard for the size or dimensions of a library entrance.  (*See* **Exhibit 5** at

25  LVCCLD000292.)  There is no articulated or plausible justification for this restriction.  Indeed, in

26

27          [3]      Further, this spot requires that the petitioner block a handicapped access ramp.

RANDAZZA | LEGAL GROUP

RANDAZZA | LEGAL GROUP

1   granting the preliminary injunction and creating a new petition zone, the Court stated that it was

2   striking a balance between allowing Mr. Deans to effectively gather signatures and giving library

3   patrons "at least 30 feet of unfettered access to the doors."  (ECF No. 25 at 9.)  This balance could

4   not be reached while complying with Defendant's 50-foot requirement.

5           The only properly articulated justification for these restrictions is ensuring that people may

6   exercise their petition rights on Library property.  Restricting petitioning activity to a small spot

7   outside of a public library does absolutely nothing to accomplish this interest.  To the extent

8   Defendant attempts to justify this policy by reference to ensuring patron safety, there is no plausible

9   explanation as to how this restriction serves a substantial government interest and leaves open ample

10  alternative channels of communication.  There are no studies justifying this policy, nor are there any

11  non-speculative harms that the Petition Policy hopes to avoid.  In fact, Jakus testified that the check

12  in procedure existed "just so that we know somebody's out there petitioning in case somebody comes

13  in and starts complaining to us that somebody's petitioning, so that we're aware of what's going on

14  in our . . . area."  (ECF No. 238:23-239:12.)  There is thus no concrete, articulable harm the "check

15  in" requirement is designed to prevent.  And if that were not enough, the Petition Policy is at odds

16  with Defendant's express statements about allowing people to engage in petitioning activity.  (*See* ECF

17  No. 12-7 at 6.)

18          Furthermore, Defendant appears to think that it is able to restrict all petitioning activity at all

19  library branches because NRS 293.127565 allows it to do so. (*See* **Exhibit 5** at LVCCLD000264;

20  **Exhibit 6** at Response Nos. 1, 4, 13, 15.)  This is a misreading of the statute.  NRS 293.127565(1)

21  requires buildings open to the general public to designate a spot for petitioning activity, and

22  subsection (2) provides that a person must notify a public officer or employee prior to *using that spot*.

23  The statute creates an **affirmative obligation** on the part of government entities to set aside an area

24  in which people petition, even at buildings that are not traditional public fora.  It **creates** a limited

25  public forum in areas that are otherwise nonpublic fora.  The statute does not, however, mandate a

26  restriction on petitioning to *only* these designated spots.  To interpret the statute in this way would

27  make it facially unconstitutional, as it would restrict such activity in all public fora.  The statute creates

a floor, not a ceiling, for petitioning activity.  *See Univ. & Cmty. College Sys. Of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712 (2004) ("NSG").  The Nevada Supreme Court discussed NRS 293.127565, but the government did not rely on the statute as a basis for **restricting** speech.  They argued that they could impose reasonable restrictions *despite* NRS 293.127565.  *See id.* at 725 (appellant conceding that 293.127565 creates a limited public forum at public buildings, regardless of the building's use).

Looking at the statute's legislative history, the court found that:

> NRS 293.127565(1)(c) expresses the state's public policy that election laws . . . should be liberally construed to effectuate the will of the people.  Correspondingly, any time, place, or manner restriction associated with buildings to which NRS 293.127565 pertains must not work unreasonably, in light of the totality of the circumstances, so as to deny a petition circulator his or her right to gather signatures.

*Id.* at 734.  The purpose of the statute is "to provide petition circulators areas at public buildings in which to conduct signature-gathering activities."  *Id.* at 735.  Accordingly, any restrictions on such activities at a public building "under the statute's purview must also comport with the spirit and intent of NRS 293.127565 in light of the particular circumstances."  *Id.* at 736.  Nothing in the statute **restricts** an individual's right to circulate petitions.

### 5.1.3.2    The Petition Policy Does Not Leave Open Ample Alternative Channels of Communication

Even if Defendant's Petition Policy was narrowly tailored, it does not leave open ample alternative channels of communication.  An alternative channel of communication is not "ample" if it does not allow the party to reach its desired audience.  *See Berger v. City of Seattle*, 569 F.3d 1029, 1049 (9th Cir. 2009).  Other methods of communication "may be constitutionally inadequate if the speaker's 'ability to communication effectively is threatened.'"  *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005) (quoting *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)).  While the government does not have to use the least restrictive means available under these circumstances, regulations that "do not permit leafleting outside the Free Expression Zones . . . do not provide ample alternatives for plaintiffs to express their views."  *Cuviello v. Cal Expo*, 2013 U.S. Dist. LEXIS 106058 *32 (E.D. Cal. July 27, 2013).

**RANDAZZA** | LEGAL GROUP

Defendant's designated petitioning spot is well outside the path of most pedestrian traffic to and from the east entrance of the Library; a person such as Mr. Deans would have to shout at passersby to get their attention, severely reducing the efficacy of his First Amendment activities. (*See* ECF No. 13-3 at ¶¶ 25-28.)  The Supreme Court has struck down restrictions that were less onerous than this because they did not leave open ample alternative channels of communication.  *See McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014) (finding that "buffer zone" restriction substantially burdened speech because speaker was "often reduced to raising her voice at patients from outside the zone – a mode of communication sharply at odds with the compassionate message she wishes to convey").  The *McCullen* Court recognized that "[i]n the context of petition campaigns, . . . 'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political discourse.'"  *Coakley*, 134 S. Ct. at 2536 (quoting *Meyer v. Grant*, 486 U.S. 414, 424 (1988)).  Even if Defendant's employees were confused as to the actual designated petition zone and gave Mr. Deans erroneous instructions, the PIC Manual's 50-foot buffer restriction is unambiguous and does not give petitioners adequate space to conduct their activities.

The petition spot policy is thus not a reasonable time, place, and manner restriction, and is unconstitutional.

### 5.1.4   The Rules of Conduct Are Not a Reasonable Time, Place, and Manner Restriction

Defendant's Rules of Conduct prohibit "[f]ailure to comply with reasonable staff instruction," and imposes a penalty of a complete ban on visiting any Clark County public library for up to one year for this failure.  (ECF No. 11-5.)  There is little to no explicit indication as to what Defendant's purported government interest is here.  The rule in question was implemented in July 2016, and was meant to serve as "a catchall for items not listed," because "[s]taff realizes that a policy cannot list every possible offence."  (*See* ECF No. 13-2 at 5.)  Thus, the only guidance available as to Defendant's reasoning in implementing this policy are the Library Rules of Conduct, which state that Defendant "welcomes all visitors and provides excellent service in a pleasant and safe atmosphere," prohibits "behaviors and activities that interfere with the safe, secure, and respectful use of libraries,"

1  including "[c]onduct that endangers or disturbs library users or staff in any way, or that hinders others

2  from the using the library or its resources."  (ECF No. 11-5.)  This may be a substantial government

3  interest, but the policy in question is not narrowly tailored.  "Failure to comply with reasonable staff

4  instruction" conceivably amounts to any action contrary to the instructions of Library staff.  Such a

5  free-wheeling restriction burdens substantially more speech than is necessary to further Defendant's

6  interest.  *See Kuba*, 387 F.3d at 861.

7      For the same reasons, Defendant's policy of automatically trespassing individuals for an entire

8  year for *any* Rules of Conduct violation is not narrowly tailored.  The trespass severely infringes a

9  patron's First Amendment rights by completely foreclosing an archetypal forum for accessing

10 information and sharing ideas, and so this policy does not leave open ample alternative channels of

11 communication.  Furthermore, the length of the ban that the policy allows is unquestionably over-

12 restrictive; not allowing one even to access a public library in Clark County for one year is far too

13 harsh a punishment for not immediately complying with the directives of Library staff – no matter

14 how arbitrary or themselves unconstitutional.  Given the severity of the trespass, it is striking that

15 there is no articulable justification for it.  It is Defendant's policy to automatically trespass patrons

16 for a year, regardless of the offense.  (*See* ECF No. 30 at 17-24.)  The only basis for the one-year

17 trespass policy Defendant has offered is that other library districts also ban patrons for similar or

18 greater periods of time.  (*See id.* at 297:15-299:2.)

19     Defendant's "failure to comply with reasonable staff instruction" rule and automatic one-year

20 trespass duration for any rule violation are not reasonable time, place, and manner restrictions.  They

21 restrict grossly more expressive conduct than necessary and severely restrict the First Amendment

22 rights of library patrons.

23     **5.2    Defendant's Policies Are Void for Vagueness**

24     The constitutional guarantee of due process requires that regulations give individuals

25 reasonable notice of prohibited conduct.  To establish a void for vagueness claim, a plaintiff must

26 establish that "a regulation's prohibitive terms are not clearly defined such that a reasonable person

27 of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion."

*Miller v. City of Cincinnatti*, 622 F.3d 524, 539 (6th Cir. 2010); *see United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1994). Similarly, criminal laws must be articulated "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A great degree of specificity and clarity is required when First Amendment rights are at stake. *Gammoh v. City of La Habra*, 395 F.3d 1114, 1119 (9th Cir. 2005); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986). Finally, an ordinance can be vague if it either fails to place people on notice of exactly which conduct is criminal, or, if the possibility for arbitrary enforcement is present. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). The void for vagueness doctrine ensures that laws providing "fair warning" of impermissible conduct and protect citizens against "impermissible delegation of basic policy matters for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* Consequently, a statute that fails to constrain an official's decision to limit speech with objective criteria is unconstitutionally vague. *See id.*

Courts have repeatedly held that criminal ordinances which rely on a viewer's subjective interpretation of facts are void for vagueness. *Morales*, 527 U.S. at 56-64 (holding a provision criminalizing loitering, which is defined as "to remain in any one place with not apparent purpose," void for vagueness because the provision was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene"); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554-55 (9th Cir. 2004) (holding a statute requiring physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others"); *Free Speech Coalition v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999), *aff'd sub nom*; *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 257-58 (2002) (holding a provision that criminalized sexually explicit images that "appear[] to be a minor" or "convey the impression" that a minor is depicted unconstitutionally vague because it was unclear whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution).

*Morales* provides a useful guidepost for when enforcement of a statute or regulation may be unconstitutionally vague:

> If the police are able to decide arbitrarily which members of the public they will order to disperse, then the Chicago ordinance becomes indistinguishable from the law we held invalid in *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 (1965).  Because an officer may issue an order only after prohibited conduct has already occurred, it cannot provide the kind of advance notice that will protect the putative loiterer from being ordered to disperse.

527 U.S. at 58-59.

### 5.2.1   The Petition Policy is unconstitutionally vague

Second, the LVCCLD restriction of petitioning activity to designated spots is unconstitutionally vague simply by virtue of the fact that very few people are likely to discover a designated "petition spot" ahead of time.  To begin with, a person must first think that all public buildings may limit petitioning activity to designated spots.  The person must then be aware that Defendant is a separate entity from whichever public entity actually owns the property on which the library is located, and must know to check the Nevada Secretary of State web site for Defendant's designation of a given spot.  This is a tall order for a person of average intelligence, especially considering that Defendant's web site does not clearly identify where this designation may be found or even that it exists; after all, its Library Rules of Conduct make no mention of petitioning activity.  It is sufficient that the average person is not likely to know of the existence of a petitioning spot ahead of time to declare this policy unconstitutionally vague.

Additionally, however, the policy is vague because it does not clearly indicate where the petitioning spot is actually located, or at least the one at the east entrance of the Library.  Defendant's designation for this entrance is "[a]t the east entrance a [sic] the far edget [sic] **of the center circle**." (*See* ECF No. 11-3) (emphasis added.)  One can assume that the reasonably intelligent person would be able to decipher this designation despite its typographical errors.  Determining where the spot actually is, however, is another matter.  The east entrance consists of a large circular area with pillars that contains three circles in a layout resembling a dartboard.  (*See* ECF No. 11-6.)  The first circle is

RANDAZZA | LEGAL GROUP

1    directly in the center, and is proportionately comparable to the bullseye on a dartboard.  (*See id.*)

2    The second circle is larger and located several feet in all directions from the bullseye circle.  (*See id.*)

3    The third circle is the outer rim of the entrance and directly abuts the sidewalk and parking lot.

4    (*See id.*)  Given this layout, there are many reasonable interpretations of where the "far edge of the

5    inner circle" is.  It could be the space in the inner bullseye directly opposite the entryway doors, which

6    is approximately where Mr. Deans was circulating his petition.  It could be the space in the second

7    circle directly opposite the entryway doors.  Of course, since the area is a circle, the "far edge" could

8    also reasonably be interpreted as the circle's circumference.

9            Apart from failing to inform the public of this restriction on speech, the lack of specificity in

10    LVCCLD's designation also allows Library staff to choose spots at the east entrance of the Library

11    arbitrarily and require visitors to conduct their petitioning activities there.  That appears to be

12    precisely what happened here, when Kushner instructed Mr. Deans to conduct his activities in a small

13    area between two pillars that would have had him blocking an entrance ramp to the Library entrance

14    plaza.  The danger of *ad hoc* designations is especially present here given that the Petition Policy states

15    that "[t]he library branch PIC has the final discretion of authority over violations of these guidelines

16    and our Library Rules of Conduct."  (ECF No. 11-4.)  If this spot was not in fact made up on the fly,

17    Defendants designated literally the least convenient and most obstructive area possible for circulating

18    petitions.  No reasonable person would read Defendants' "petition spot" designation in this manner.

19            In fact, it took counsel for Mr. Deans and Defendant several days of discussion and several

20    rounds of emails to discern where the "petitioning spot" was actually (allegedly) located.  (*See* ECF

21    No. 13-4.)  And during the preliminary injunction hearing, Jakus provided multiple interpretations of

22    the designated petition spot because she could not determine what Defendant's designation meant.

23    (*See* ECF No. 30 at 245:15-247:21.)  If even the employees of the creator of the petitioning spot

24    cannot determine what Defendant's designation means, a person of reasonable intelligence cannot

25    correctly determine it either.

26            LVCCLD's Petition Policy is thus unconstitutionally vague, in addition to its other infirmities.

1

### 5.2.2   The Rules of Conduct are unconstitutionally vague

2  The Rules of Conduct prohibit "[f]ailure to comply with reasonable staff instruction."  This is

3 a classically vague restriction.  The language of the policy does not provide any real prospective

4 indication of what conduct is prohibited.  When is a staff member's instruction "reasonable?"  That

5 is left to the library patron to guess.  The only way for a patron to ensure he is not in violation of the

6 policy is to reflexively comply with all staff instruction, whether or not the individual thinks it is

7 reasonable, or whether it violates his rights, or indeed the rights of others.  It also lacks any objective

8 standards that could potentially curtail a staff member's selective or arbitrary enforcement of this

9 restriction.  *See Miller*, 622 F.3d at 539-40 (finding void for vagueness policy giving discretion to city

10 council members with only guiding principle being that the space where the restriction applied was

11 meant to allow officials "to exercise the rights and responsibilities specified in the Charter of the City

12 of Cincinnati").

13  This vagueness is especially impermissible here, as "where a vague statute 'abut[s] upon

14 sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those]

15 freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone . . .

16 than if the boundaries of the forbidden areas were clearly marked.'"  *Grayned v. City of Rockford*, 408

17 U.S. 104, 109 (1972).  Whether any conduct violates this rule is essentially left to the unfettered

18 discretion of library staff.  They can issue any order to a patron, and that patron risks a one-year ban

19 from all LVCCLD library branches for a year if he fails to comply, with an unknown appeals process

20 available to him if he wishes to dispute the trespass notice.  A single library employee is thus free to

21 restrict any patron's First Amendment right to receive information for an entire year whenever he

22 likes.  The vagueness of the rule, combined with the ability for arbitrary enforcement, makes it

23 inevitable that patrons will self-censor their expressive activities to avoid Defendant's draconian

24 trespasses.  It is thus unconstitutional.

25

26

27

RANDAZZA | LEGAL GROUP

**6.0    CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment in Plaintiff's favor as to liability on all of his claims and should order Defendant to pay Plaintiff's attorneys' fees.  If the Parties are unable to stipulate to an appropriate amount of money damages, the matter should proceed on that issue.

Dated: October 10, 2017                    Respectfully Submitted,

                                            /s/ Marc J. Randazza
                                            Marc J. Randazza (NV Bar # 12265)
                                            Alex J. Shepard (NV Bar # 13582)
                                            RANDAZZA LEGAL GROUP, PLLC
                                            4035 S. El Capitan Way
                                            Las Vegas, NV 89147

                                            *Attorneys for Plaintiff,*
                                            *William Deans*

CASE NO: 2:16-cv-02405-APG-PAL

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 10, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that a true and correct copy of the foregoing document is being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully submitted,

Trey A. Rothell
Employee, Randazza Legal Group, PLLC